1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHARON WATKINS, et al.,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF SAN JOSE, et al.,<br><br>    Defendant. | Case No. 15-CV-05786-LHK<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 44 |

Plaintiffs Deviny Buchanan, on behalf of herself and her minor daughter Laniyah Watkins; Sharon Watkins; and Sylvia Buchanan (collectively, "Plaintiffs") bring the instant suit against Defendants City of San Jose, Police Officer Ryan Dote, and Police Officer James Soh (collectively, "Defendants") for the shooting of Phillip Watkins. Before the Court is Defendants' Motion for Summary Judgment. ECF No. 44 ("Mot."). Having considered the parties' briefing, the relevant law, and the record in this case, the Court GRANTS Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Factual Background

The instant suit arises from the fatal shooting of Phillip Watkins ("Decedent") by Officers

Dote and Soh on February 11, 2015.

### 1. The Parties

Sharon Watkins is Decedent's mother, and was not at the scene where Decedent was shot. Deviny Buchanan was Decedent's fiancee at the time of Decedent's death. Laniyah Watkins is Decedent's and Deviny Buchanan's daughter. Deviny Buchanan was present when Decedent was shot and is a witness to the shooting. Sylvia Buchanan is Deviny's mother, was present when Decedent was shot, and is a witness to the shooting.

Officers Dote and Soh (the "officers") are the San Jose Police Officers who shot Decedent. The City of San Jose (the "City") is the officers' employer.

### 2. The 911 Call, Dispatch of the Officers, and the Shooting of Decedent

On February 11, 2015, at 5:00 p.m., an unidentified male called 911 and reported that a man with a knife was in the caller's house at 1377 Sherman Street in San Jose, California and was threatening to kill the caller's family. ECF No. 44-2, Declaration of Raul Corral ("Corral Decl.") ¶ 5 & Ex. 1. The caller stated that he was locked up in a room with his kids and asked for help to "please come fast." *Id.* Deviny Buchanan identified the caller as Decedent by his voice. ECF No. 44-1 at 26–27, D. Buchanan Decl. at 137–38.

At 5:01:27 p.m., San Jose Police Dispatch broadcasted the incident. ECF No. 44-1 at 144 ("Dispatch Log"). Several officers in the area responded. *Id.* Officers Dote and Soh arrived on the scene first, and notified dispatch of their arrival at 5:03:14 p.m. *Id.* at 145. Officers Dote and Soh parked several houses away from 1377 Sherman Street and exited their vehicle. ECF No. 44-3, Declaration of Ryan Dote ("Dote Decl.") ¶ 6; ECF No. 44-1 at 69–71, Deposition of Ryan Dote ("Dote Depo") at 76–78. Officers Dote and Soh were wearing police uniforms. ECF No. 49-4 at 18.

Decedent was speaking with Deviny and Sylvia Buchanan in front of the house located at 1377 Sherman Street when the officers arrived. ECF No. 44-1 at 67, Dote Depo. at 65. Decedent saw the officers and began walking towards them with a knife in his hand. ECF No. 44-1 at 75, Dote Depo. at 86–87. Decedent's eyes were "locked" on the officers. ECF No. 44-1 at 94, Dote

2

Depo. at 122. According to the officers, the knife was in Decedent's right hand. ECF No. 44-1 at 78, Dote Depo. at 90–92. The officers were able to identify that Decedent was holding a knife because Decedent's "right hand was outstretched to the side of his body" with the knife "pointed up." *Id.* At 5:04:38 p.m., the officers informed dispatch that "[w]e have a male with a knife; he's walking towards us." Dispatch Log at 145. The knife was a CRKT-brand partially-serrated 8 to 9 inch folding pocket knife with a 3 to 4 inch blade that Deviny Buchanan states was her brother's "Marine knife." ECF No. 49-11 at 2 (picture of bloodstained knife); ECF No. 44-1 at 38, Deposition of Deviny Buchanan ("D. Buchanan Depo.") at 161 ("It was my brother's Marine knife.")

At 5:04:45 p.m., Officers Dote and Soh drew their guns in a "low-ready" position. Dispatch Log at 145. Either immediately before or after drawing their guns, the officers commanded Decedent to "stop and get on the ground and drop the knife." ECF No. 44-1 at 89, Dote Depo. at 115; D. Buchanan Tr. at 119, 122 ("I remember the police saying, "Stop, stop" or "Stop where you're at." I don't know the exact wording that they used, but it was like, "Stop where you're at" or something."). According to the officers, Decedent did not respond to the commands and continued advancing toward the officers. ECF No. 44-1 at 89–90, Dote Depo. at 115–16 ("I raised my firearm towards Mr. Watkins. As soon as he didn't comply with our lawful order to stop and get on the ground and drop the knife . . . because it was evident at that point he was not going to do any of those.").

The officers assert that Decedent then began "running and sprinting" towards the officers. Dote Decl. ¶ 12; ECF No. 44-4, Declaration of James Soh ("Soh Decl.") ¶ 10; *see also* ECF No. 44-1 at 79, Dote Depo. at 95 ("I would estimate he took two or three steps as a walk, and then immediately he started sprinting towards us."). Sylvia Buchanan states that Decedent started "trotting" or running towards the officers. ECF No. 44-1 at 56, Deposition of Sylvia Buchanan ("S. Buchanan Depo.") at 79; ECF No. 50-1 at 10, S. Buchanan Depo. at 108 ("I just know that he was running. Okay? He was running.").

Other witnesses agree that Decedent started to run towards the officers. Osvaldo

Gonzalez, a passerby, stated in a deposition that Decedent was walking towards the officers and then began to "accelerate his pace" and was "starting to run." ECF No. 44-1 at 118–20, Deposition of Osvaldo Gonzalez ("Gonzalez Depo.") at 15–17 ("I actually did see him picking up the run."). Gonzalez states that he "knew something was going to happen" because of "the pace [Decedent] was going towards the officers." *Id.* Gonzalez did not see the shooting itself because he was trying to take out his phone to take a video of what was going to happen. *Id.* Gonzalez started recording seconds after the shots were fired. ECF No. 44-1 at 123, Gonzalez Depo. at 25.

Erica Menchaca, another witness at the scene of the shooting, stated in a deposition that she could only see the top half of Decedent's body, but that it looked like Decedent "accelerate[d]" and "lunge[d] toward the officers." ECF No. 44-1 at 129–31, Menchaca Depo. at 25–27. She stated it was almost like he was "initiating some sort of fight or a run forward." *Id.* Alternatively, she described the lunge forward as a "taunt," which she further described as a "lunge" and an action that "someone would do if they were trying to engage someone" to "try to chase him" or "to try to break through [the officers]." *Id.*

Officers Dote and Soh each fired at Decedent. Officer Dote fired six shots, and Officer Soh fired four shots. Dote Decl. ¶ 26; Soh Decl. ¶ 24. These shots took approximately two to three seconds to fire, stopped Decedent's advance, and caused Decedent to fall to the ground. At 5:04:55 p.m., seventeen seconds after Decedent had started walking towards the officers with a knife and ten seconds after the officers had drawn their guns on Decedent, the officers reported the shots to dispatch. Dispatch Log at 145. Decedent was still holding the knife in his right hand after he fell to the ground. Dote Decl. ¶ 27; Soh Decl ¶ 25.

The officers both testified that they heard yelling when they began shooting. Sylvia Buchanan asserts that she was behind Decedent and yelling at the officers: "He needs your help. Help him. Help him and Tase him." ECF No. 44-1 at 57, S. Buchanan Depo. at 80. Officer Soh stated that he heard someone yelling "No" multiple times, and Officer Dote stated that he heard someone yelling, "Stop. You don't have to do this," but that he could not distinguish what exactly was said after that. Soh Decl. ¶ 13; ECF No. 44-1 at 80, Dote Depo. at 96 ("I know she was

screaming and yelling, but I don't remember exactly what she was saying.").

Officer Dote states that although he had seen Sylvia Buchanan with Decedent before Decedent started walking towards the officer, at the time the shots were fired "she wasn't directly behind [the Decedent]" and "was not in the backstop" i.e., "the line of fire" when he fired. ECF No. 49-5 at 54, Dote Depo. at 131. Sylvia Buchanan states that she "dropp[ed] to the ground." ECF No. 44-1 at 56, S. Buchanan Depo. at 79–80. Deviny Buchanan states that she had ran back up towards the house before the shooting began. ECF No. 44-1 at 17, D. Buchanan Depo. at 120 ("And then the police drew their guns. And right at that point, I turned around and started walking back towards the house, and I covered my eyes.").

Officer Dote estimated that he started shooting when Decedent was "maybe 40ish feet" away. ECF No. 44-1 at 84, Dote Decl. at 103. Officer Soh stated in a deposition that "I knew that if I had delayed another second longer, he would been [sic] right on top of me." ECF No. 44-1 at 105, Soh Depo. at 113. The officers' estimates of distances were different immediately after the shooting. Officer Dote estimated that Decedent was 20 feet away when he began shooting, but acknowledged the distance was further at his deposition. ECF No. 49-5 at 51–52, Dote Depo. at 122–23 ("That was based on approximations, but that's what I told Detective Corral."). After the shooting, Officer Soh told another officer that Decedent was 10 to 15 feet away when Officer Soh opened fire, but he states that he had "misinterpreted the question" and that he knew that Decedent was "21 feet or more" from the officers when Officer Soh began shooting. ECF No. 49-4 at 40, Soh Depo. at 109. There is no evidence in the record of which officer shot first and whether there was a delay between the two officers' shooting.

Based on photos of the crime scene and measurements taken at the scene of the shooting, Plaintiffs estimate the distance between the Decedent and the officers when the officers began shooting to be between 52 feet, 9 inches and 54 feet, 9.5 inches (the Court rounds up to 55 feet for the purposes of this order), ECF No. 49-1, Declaration of Gregg Dietz ("Dietz Decl.") ¶ 8, and Defendants estimate this distance to be 46 feet. ECF No. 44-5, Declaration of Barry Witt ("Witt Decl.") ¶ 7; Opp'n at 2. Plaintiffs' and Defendants' estimates were obtained by measuring the

Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

distance between marks made by Officer Dote on a photo of the scene after the shooting. *Id.*

Officer Dote estimates that Decedent was "approximately 10 to 15 feet" away when Decedent fell to the ground. ECF No. 44-1 at 85, Dote Depo. at 104. Measurements based on a video taken by witness Gonzalez immediately after the shooting show that Decedent fell to the ground approximately 17 feet 10 inches from the officers. Witt Decl. ¶ 4.

As the officers were shooting, the officers were moving backwards. ECF No. 44-1 at 85, Dote Depo. at 104 ("We were doing a tactical withdraw, going backwards. . . Q. Okay. So you started firing. And then you were going backwards, right? A. Correct."); Dote Decl. ¶ 20 ("While the man was running at us, I was doing a tactical retreat, taking small steps backward to attempt to create additional time and distance between the man and me."); Soh Decl. ¶ 19 (same). From Decedent's starting point in front of 1377 Sherman Street, to the spot where Decedent fell to the ground after being shot, Decedent covered a total distance of approximately 130 feet. Witt Decl. ¶ 5.

Plaintiff Deviny Buchanan's and Plaintiff Sylvia Buchanan's testimony largely corresponds to the account of the officers. Deviny Buchanan told Decedent's mother on the phone immediately after the accident that "when [Decedent] saw the cops walking up, he took out a knife and ran at them." Corral Decl. Ex. 3 at 8–9; ECF No. 44-1 at 28, D. Buchanan Depo. at 148; *see also* ECF No. 44-1 at 31, D. Buchanan Depo. at 151 (Deviny Buchanan telling her friend on the phone that Decedent "ran at the fucking cops with a knife"). In an interview with the officers on the day of the shooting, Deviny Buchanan provided a more detailed account:

> [He] walked outside, and I was looking at him from the porch. And, like, I saw that he had a knife. Like my back was towards the police at this point; so I didn't even know they were, like, actually walking up the street. And he, like, looked down the street, and he looked at me, and, like, I saw the knife. I thought he was going to come towards me with the knife, and then I stepped to the side, and he walked right past me, and I thought he was walking towards the kids in the car. So that's when I turned around, and I see the police walking up the street.
>
> And Phill, like, took out the knife and started, like, walking towards the police. I'm like, 'Phill, what are you doing? Just stop.' And he just kept walking. And the police are like, uhm, 'Stop right there. Stop right there.' And then me and my mom were just like, 'Please don't shoot, because he wants you to shoot. Just

don't shoot. Please don't shoot.'

And then after that, uhm, I kind of ran back on the porch because I didn't want to see what was going to happen, because I knew what was going to happen, and I just heard the gunshots after that.

ECF No. 44-1 at 41, D. Buchanan Depo. at 167–68.

In a police interview with Sylvia Buchanan on the day of the shooting, Sylvia Buchanan stated that Decedent was "running toward the officers." ECF No. 50-1 at 9–10; Corral Decl. Ex. 5 at 30–33. When asked whether Decedent was "jogging or charging the officers," Sylvia Buchanan stated that she did not know and that it "just happened so fast." *Id.* at 10. Sylvia Buchanan stated that "[Decedent] was running to them" and that she was "trying to get behind him [and] hollering, begging, saying, 'Phil, please, stop. Stop." *Id.* at 10. Sylvia Buchanan stated that the police officers drew their guns when Decedent began running towards them, and that she could not hear whether the officers commanded Decedent to stop "because [she] was screaming[,] . . . hollering." *Id.* at 11.

However, in a deposition taken in the instant suit, Sylvia Buchanan provides a different account from her police interview. In the deposition, Sylvia Buchanan states that Decedent first started walking towards the officers, then started trotting, and that when the officers commanded Decedent to stop, Decedent stopped. ECF No. 44-1 at 56–57, S. Buchanan Depo. at 79–80 ("Then he stopped, because they were telling him to stop, and he stopped."). Sylvia Buchanan stated that she does not remember what happened after Decedent stopped. *Id.* ("Q. And after he stopped, did he start moving toward them again? A. The only thing I remember is gunfire. Q. So you don't remember whether he started moving toward them again? A. I was screaming, and I was moving. So whether he was moving, I can't remember. The only thing I remember is them shooting at him, dropping to the ground, and they kept shooting.").

### 3. Decedent's Mental State and the Events Before the Arrival of Officers Dote and Soh

At the time of the shooting, evidence in the record shows that Decedent was suicidal.[1]

---

[1] After the shooting, Deviny Buchanan told a police detective that Decedent was on steroids and that Decedent's steroid use correlated with his mood swings. ECF No. 44-1 at 39, D. Buchanan

ECF No. 49-3 at 9, S. Buchanan Depo. at 35 ("[Decedent] said he didn't know if he wanted to live."). ECF No. 44-1 at 30, D. Buchanan Depo. at 150. On the day of the shooting, February 11, 2015, Deviny Buchanan told Watkins that she did not want to marry him anymore because of his behavior. ECF No. 44-1 at 135 (Deviny Buchanan text to Decedent: "Phill im sorry but im not gonna marry things are no where near ok and how u acted yesterday is fucked up no means no and always has but itjisy [sic] never meant no to u . . ."). During the text message exchange, Decedent told Deviny Buchanan that "honestly I could kill u and kill myself out of the love or bond I have for you and us together . . . ." ECF No. 44-1 at 140.

Later that day, approximately one hour before the shooting, Deviny Buchanan and Sylvia Buchanan came home to find Decedent sitting on their front porch. ECF No. 44-1 at 11, D. Buchanan Depo. at 103. Decedent was distraught because Deviny Buchanan had told Decedent that she no longer wanted to marry him. ECF No. 44-1 at 140. Deviny Buchanan asked her mom, Sylvia Buchanan, to talk to Decedent and calm him down. ECF No. 44-1 at 12–14, D. Buchanan Depo. at 106–08. Sylvia Buchanan asked Decedent to talk with her upstairs in the house. *Id.*

While upstairs, Decedent told Sylvia Buchanan that he did not want to live anymore. ECF No. 44-1 at 53, S. Buchanan Depo. at 39. From downstairs, Deviny Buchanan heard Decedent say that "he wanted to kill himself and he was going to kill himself." ECF No. 44-1 at 34, D. Buchanan Depo. at 156. Deviny Buchanan also heard Decedent say, "[s]he doesn't want to be with me, but I want to be with her. She's trying to leave me, and I'm not going to let that happen." *Id.* Deviny Buchanan also states that "he said he'd kill me." *Id.* Deviny Buchanan then heard banging from upstairs so she "grabbed the kids, and [] put them in the truck outside." *Id.* Deviny Buchanan also took all of the kitchen knives in the kitchen and hid them in the car. ECF No. 44-1 at 24, D. Buchanan Depo. at 132 ("I took out my mom's whole knife drawer, and I took her knife block and put it in the car."). However, while upstairs, Decedent obtained the knife he was carrying when he was shot. ECF No. 44-1 at 38, D. Buchanan Depo. at 161 ("It's a

Depo. at 166.

pocketknife. It was my brother's Marine knife. . . . I should have known that's why he was going upstairs.").

During the conversation between Decedent and Sylvia Buchanan upstairs, Decedent said, among other things, that he didn't know if he wanted to live and that the devil was after him. ECF No. 44-1 at 53, S. Buchanan Depo. at 39. When Decedent would not calm down, Sylvia Buchanan called the mental health department of Valley Medical Hospital to ask what she should do. ECF No. 44-1 at 51–53, S. Buchanan Depo. at 37–39. Sylvia Buchanan was told that a police intervention unit could be sent to help Decedent, or Sylvia Buchanan could bring Decedent into the hospital herself. *Id.*; ECF No. 49-3 at 16, S. Buchanan Depo. at 66–67.

While not exactly clear when, at some point around when Sylvia Buchanan was calling the Valley Medical Hospital, Decedent made the 911 call about a man with a knife that led to the arrival of Officers Dote and Soh at 1377 Sherman Street. Deviny Buchanan described Decedent's stated purpose for calling the police in a recorded phone call to Sharon Watkins, Decedent's mother, as follows:

> We tried. He was -- because he was acting crazy, and we tried to call the psych ward, and [Decedent] was like, 'Fuck it. I'm going to end it,' and he called the police. And he said, 'When they get here, I'm going to fucking go at them, and I'm going to let them take care of it.' I don't -- I don't know.

ECF No. 44-1 at 30, D. Buchanan Depo. at 150.

At that point, Sylvia Buchanan decided to bring Decedent to Valley Medical Hospital herself either because she did not think police intervention was necessary, ECF No. 49-3 at 16, S. Buchanan Depo. at 66–67 (Sylvia testifying that she did not think police intervention was necessary), or because Decedent had been saying that he wanted to call the cops so that he could commit suicide by charging at them, ECF No. 44-1 at 34–35, D. Buchanan Depo. at 156–57 ("And my mom's like, 'Well, I don't want to call the cops, because he's saying he wants to call the cops so that he can charge at them.'"). Decedent agreed to go to the hospital. ECF No. 49-3 at 16, S. Buchanan Depo. at 66–67.

Sylvia Buchanan and Decedent walked outside toward Sylvia Buchanan's car. ECF No.

9

49-3 at 17, S. Buchanan Depo. at 68. Deviny Buchanan either was already outside or walked outside with Sylvia Buchana and Decedent. At that point, Officers Dote and Soh arrived, and the shooting described above occurred.

Deviny Buchanan described Decedent's actions to Sharon Watkins in a recorded phone conversation after the shooting: "Phill tried to commit suicide and he ran at the cops with a knife and they fucking shot him." Corral Decl. Ex. 3 at 5:55–6:58 ("Phill came downstairs and said 'I called the police so they'll shoot me.'"). In a recorded phone call to Deviny Buchanan's friend, Tiffany, Deviny Buchanan stated that "[Decedent] called the cops on himself and ran at the fucking cops with a knife." *Id.* at 12:15–12:54; ECF No. 44-1 at 31, D. Buchanan Depo. at 151. Deviny Buchanan also sent a text message at 5:40 p.m. on the day of the shooting that stated "phill tried to commit suicide and called the cops amd [sic] ran at them wit [sic] a knife and the cops shot him." ECF No. 44-2 at 8. In an interview with the police later on the day of the shooting, Deviny Buchanan stated that "it kind of looked like [Decedent] wanted [the police] to shoot him" and "[h]e called [the police]. So it's like he wanted them to come just so he could charge at them to get shot." Corral Decl. Ex. 4 at 37:30–37:58; ECF No. 44-1 at 42–43, D. Buchanan Depo. at 169–70.

### B.    Procedural Background

On December 17, 2015, Plaintiffs filed the instant suit. *See* Complaint, ECF No. 1 ("Compl."). Plaintiffs assert five causes of action: (1) violation of civil rights for use of excessive force under 42 U.S.C. § 1983; (2) violation of civil rights for use of excessive force under California Civil Code § 52.1 ("Bane Act Claim"); (3) commission of an act of violence motivated by racial bias in violation of California Civil Code § 51.7 ("Ralph Act Claim"); (4) assault; and (5) negligence. *Id.* ¶¶ 26–56. On March 7, 2016, Defendants filed an answer. ECF No. 10.

On March 9, 2017, Defendants filed the instant motion for summary judgment. *See* Mot. On March 23, 2017, Plaintiffs filed an opposition, ECF No. 49 ("Opp'n"), and on March 30, 2017, Defendant filed a reply, ECF No. 50 ("Reply").

### II.    LEGAL STANDARD

10

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. However, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### III. DISCUSSION

Defendants argue that (1) Sharon Watkins, Decedent's mother, does not have standing to bring the instant suit, (2) Plaintiffs' § 1983 claim fails because the Officers' actions were reasonable and are protected by qualified immunity, (3) Plaintiffs' Bane Act Claim for violation of civil rights for use of excessive force fails because the officers' actions were reasonable, (4) Plaintiffs' Ralph Act claim for commission of an act of violence motivated by racial bias fails because there is no evidence that the officers' actions were motivated by racial bias, and (5) Plaintiffs' assault and negligence claims fail because the officers' actions were reasonable.

#### A. Sharon Watkins' Standing

Plaintiffs' complaint names Sharon Watkins as a plaintiff with respect to Plaintiffs' § 1983 claim, Bane Act claim, and Ralph Act claim.[2] Sharon Watkins is Decedent's mother. Defendants argue that Sharon Watkins has no standing to bring the § 1983 claim, Bane Act claim, or Ralph Act claim. These are survivor claims, and Decedent's daughter (not mother) is Decedent's survivor. Plaintiffs concede that Sharon Watkins does not have standing to bring these claims. Opp'n at 6. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment as to Sharon Watkins' § 1983 claim, Bane Act claim, and Ralph Act claim.

#### B. Section 1983 Claim

Defendant argues that Plaintiffs' § 1983 claim against Officers Dote and Soh fails because (1) the officers' actions were reasonable and thus did not violate the Fourth Amendment, and (2) the officers' are protected by qualified immunity.[3] The Court addresses each argument in turn.

##### 1. Reasonableness of the Officers' Actions

The United States Supreme Court has held that courts must evaluate allegations that an officer's use of force, including deadly force, violates the Fourth Amendment under a standard of "[objective] reasonableness." *Scott v. Harris*, 550 U.S. 372, 383 (2007). Such an inquiry requires

---

[2] Only Sylvia Buchanan and Deviny Buchanan bring the remaining assault and negligence claims.
[3] No § 1983 claim was ever brought against the City of San Jose (as opposed to Officers Dote and Soh individually). Thus, the Court need not grant or deny summary judgment as to a § 1983 claim against the City of San Jose.

the court to "consider the totality of the circumstances." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc) (citation omitted)). "Factors relevant to assessing whether an officer's use of force was objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). However, as a general rule, "[a]n officer's use of deadly force is reasonable [] if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)) (emphasis omitted).

The Ninth Circuit has established additional principles in circumstances where a suspect is holding a weapon. "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997). However, "where a suspect *threatens* an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (emphasis added) (collecting cases). "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Thus, "[t]he key issue . . . is whether a reasonable jury would necessarily find that [an officer] perceived an immediate threat of death or serious physical injury at the time" the officer used deadly force. *Gonzalez*, 747 F.3d at 794. "All determinations of unreasonable force 'must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Henrich*, 39 F.3d at 914 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

Courts applying these principles have consistently found officers' use of deadly force reasonable when a suspect is approaching the officers with a deadly weapon. In *City & County of*

13

*San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015), for example, the United States Supreme Court held that officers were justified in using deadly force against a mentally ill person who was advancing on officers with a knife. *Id.* at 1775. Similarly, in *Lal v. California*, 746 F.3d 1112 (9th Cir. 2014), the Ninth Circuit held that police were justified in shooting a suspect eight times who had led police on a car chase, threw rocks at police officers after the suspect had exited his car, and, finally, had advanced towards officers at an irregular pace while holding a football sized rock over his head. *Id.* at 1114.

More specifically, multiple district courts have held that officers are justified in using deadly force against an advancing suspect that is holding a knife. *See, e.g.*, *J.A.L. v. Santos*, 2016 WL 913743, at *5 (N.D. Cal. Mar. 10, 2016) ("Sgt. Santos fired twice at Mr. Lopez when Mr. Lopez, with a blade in his hand, ran toward Officer Van der Hoek after Mr. Lopez had ignored Sgt. Santos's commands to remain on the ground, to show his hands, and to drop the blade, and after Officer Van der Hoek had attempted to subdue Mr. Lopez with a Taser."); *Robbins v. City of Hanford*, 2006 WL 1716220, at *15 (E.D. Cal. June 19, 2006) ("Given the Decedent's conduct of backing Smith into a corner while making threatening motions with the knife and the Decedent's prior history of violence, the Decedent posed an imminent threat to Smith and Diener.").

Here, Officers Dote and Soh had probable cause to believe that Decedent posed a immediate threat of death or serious physical injury to themselves. Officers Dote and Soh were responding to a 911 call from which the officers believed that an unidentified man was threatening a man and his children with a knife at 1377 Sherman Street. Dispatch Log at 144–45. When Officers Dote and Soh arrived on the scene, Decedent was over 130 feet away from the officers. Witt Decl. ¶ 5. Decedent was talking with two women, but when he saw the officers he raised a knife in his right hand. ECF 49-5 at 32, Dote Depo. at 91. Decedent's eyes "locked" on the officers as Decedent began walking towards the officers. ECF No. 44-1 at 94, Dote Depo. at 122. The officers drew their guns in a low-ready position, and both of the officers commanded Decedent to stop and to drop the knife. Dote Decl. ¶ 13, 15; Soh Decl. ¶ 12, 14,   However, Decedent continued advancing and began to run towards the officers with the knife in his right

14

hand. *See* ECF No. 44-1 at 79, Dote Depo. at 95 ("I would estimate he took two or three steps as a walk, and then immediately he started sprinting towards us.").

The officers then opened fire on Decedent. Dote Decl. ¶ 26; Soh Decl. ¶ 24. The parties disagree about the distance between the officers and Decedent when the shooting began. Defendants argue that Decedent was 46 feet away from the officers. Witt Decl. ¶ 7. Plaintiffs argue that Decedent was up to 55 feet away from the officers. Dietz Decl. ¶ 8. Officer Soh testified to his perception at the time: "I knew that if I had delayed another second longer, he would been [sic] right on top of me." ECF No. 44-1 at 105, Soh Depo. at 113. Sylvia Buchanan also stated in a deposition that Decedent was close to the officers when the shooting occurred because she "could see the fire from their guns." ECF No. 44-1 at 58, S. Buchanan Depo. at 83.

Plaintiff Sylvia Buchanan's and Plaintiff Deviny Buchanan's own statements immediately after the shooting confirm that Decedent ran towards the officers with a knife. A recording immediately after the shooting records Deviny Buchanan telling Decedent's mother, Sharon Watkins, over the phone that "when [Decedent] saw the cops walking up, he took out a knife and ran at them." ECF No. 44-1 at 28, D. Buchanan Depo. at 148. Similarly, in a police interview with Sylvia Buchanan on the day of the shooting, Sylvia Buchanan stated that Decedent was "running toward the officers." ECF No. 50-1 at 9–10, S. Buchanan Depo. at 79.

On a motion for summary judgment, the Court must take the evidence in the light most favorable to Plaintiffs. Thus, the Court assumes as true the distance proposed by Plaintiffs, that is, when Officers Dote and Soh opened fire on Decedent, Decedent was 55 feet rather than 46 feet away from the officers. However, it is undisputed that after the officers started firing, Decedent continued advancing towards the officers while being shot ten times and fell to the ground 17 feet 10 inches from the officers.[4] Witt Decl. ¶ 4. If the officers had been standing still while shooting Decedent, Decedent would have covered a distance of 37 feet while being shot. However, the

---

[4] In Plaintiffs' opposition, Plaintiffs assert that Decedent was shot while "standing nearly fifty-five feet away from [the officers] holding a knife" and that Decedent was not running. Opp'n at 16. However, this assertion does not create a triable issue of material fact as discussed in detail below in Section III.B.1.iii.

Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

officers' undisputed testimony indicates that the officers were moving backwards in a "tactical withdraw" while firing at Decedent. Thus, Decedent likely covered more than 37 feet while being shot. The officers stated in depositions that the shooting occurred over a period of 2 to 3 seconds. ECF No. 44-1 at 87, Dote Depo. at 106.

Under these time and distance estimates, Decedent was moving at a pace of between at least 12.3 (37 feet over 3 seconds) and 18.5 feet per second (37 feet over 2 seconds) *while* he was being shot.[5] At that pace, Decedent could have covered the 55-foot distance between Decedent and the officers within 3 to 4.5 seconds. Moreover, given the distance covered by Decedent after the officers began shooting, if the officers began firing 1 to 1.5 seconds later than they did, Decedent would have reached the officers before falling to the ground.

These circumstances are similar to those in *Estate of Yanira Serrano v. Trieu*, 2016 WL 1089225 (N.D. Cal. Mar. 21, 2016). In *Serrano*, a district court in this district held that an officer was justified in shooting an overweight, limping woman armed with a knife that had been chasing the officer after he had responded to a domestic violence call. *Id.* at *6. The officer had retreated approximately 160 feet before stopping and facing the woman, who was then 15 to 20 feet away from the officer. *Id.* at *6. Although the woman was overweight and had a limp, "the uncontradicted evidence presented by defendants is that Ms. Serrano could have traversed the fifteen to twenty feet between herself and Deputy Trieu in less than two seconds." *Id.* As a result, the *Serrano* court held that "[u]nder such circumstances, to require Deputy Trieu to have waited to shoot Ms. Serrano until she was any closer to him would be to unjustifiably put Deputy Trieu's life at risk by affording him too narrow a window in which to react to her attack." *Id.*

The Court finds *Serrano* directly on point here. The officers had been informed by dispatch that a man had been threatening a family with a knife at 1377 Sherman Street. The Decedent, with a knife in his right hand and with his eyes locked on the officers, was advancing

---

[5] Moreover, Decedent was likely moving even faster because the 37-foot distance estimate does not take into account the fact that Officers Dote and Soh were backing up in a "tactical withdraw" while shooting at Decedent.

toward the officers. ECF No. 44-1 at 94, Dote Depo. at 122. Decedent was moving at fast enough pace that he would have reached the officers within seconds. *See* ECF No. 44-1 at 118–20, Gonzalez Depo. at 15–17 (witness stating that he "knew something was going to happen" because of "the pace [Decedent] was going towards the officers"); ECF No. 44-1 at 129–31, Menchaca Depo. at 25–27 (witness stating that it looked like Decedent "accelerate[d]" and "lunge[d] toward the officers" in a manner that he was "initiating some sort of fight or a run forward").

The fact that Officers Dote and Soh had been trained that a suspect with a knife is a danger of imminent harm to officers when they are within 21 feet of the officer does not change the Court's finding. ECF No. 44-1 at 90, Dote Depo. at 116 (explaining that Dote was trained that "anyone or somebody armed with a knife" poses a threat of grave bodily injury if they are within 21 feet); s*ee also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1261 n.1 (10th Cir. 2008) (noting officer training manual "instructs that knife-wielding persons within 21 feet pose an 'imminent threat' to officers based on the time in which the distance can be closed in an attack"); *Chavez v. Las Vegas Metro. Police Dep't*, 2014 WL 374444, at *8 (D. Nev. 2014) (noting officer training manual counsels that once "individual[ ] with [an] edged weapon[ ], such as [a] knife[] . . . gets within 21 feet, the individual poses a risk of death or serious physical injury"). Nothing in the record indicates that a suspect with a knife outside the 21-foot distance does not pose an imminent risk of harm. Indeed, Officer Dote testifies that "at 21 feet, that's almost too late to start, you know, engaging a threat if they are coming at you with a deadly weapon." ECF No. 44-1 at 93, Dote Depo. at 119. In this case, Decedent was running towards the officers with a knife and was within a few seconds of reaching them. Moreover, when Decedent finally fell to the ground, he was 17 feet 10 inches from the officers—within 21 feet of the officers. Accordingly, as with the suspect in *Serrano*, Decedent posed a risk of imminent harm.

Although the officers may have been in *more* danger if the officers had waited for Decedent to advance closer to the officers, the pace of Decedent's advance and his failure to follow direct commands to drop the knife and get on the ground indicate that the officers had "probable cause to believe that the suspect pose[d] a significant threat of death or serious physical

injury to the officer[s].'" *Henrich*, 39 F.3d at 914. Indeed, "[a] reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'" *Larsen*, 511 F.3d at 1260. Moreover, a suspect running at officers with a knife in hand is a paradigmatic example of a "tense, uncertain, and rapidly evolving" situation. *Henrich*, 39 F.3d at 914. The officers were faced with a decision to stop a quickly advancing suspect who, in a manner of seconds, could have caused death or significant bodily injury to either or both officers. The Court does not find it unreasonable that the officers deployed deadly force to stop that suspect's advance.

However, Decedent makes a number of arguments that other circumstances cause the officers' actions to be unreasonable and that there are genuine disputes of material fact that make summary judgment inappropriate. Decedent argues that (1) the officers were unreasonable because they should have used another method of stopping Decedent, (2) Decedent's mental illness made the officers' actions unreasonable, (3) there is a genuine dispute of material fact as to whether Decedent was moving forward when he was shot, and (4) there is a genuine dispute of material fact as to whether Decedent's arm was in a "threatening" position. The Court addresses each of these arguments in turn.

### i.     Alternative Methods of Stopping Decedent

Plaintiffs argue that the officers should have used a taser or taken other actions rather than shooting Decedent at the time that they did. However, "[o]fficers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [the courts have identified] as reasonable." *Glenn v. Wash. Cty.*, 673 F.3d 864, 876 (9th Cir. 2011) (internal quotation and citation omitted). In that regard, an officer must "consider what other tactics if any were available," and only "if there were clear, reasonable and less intrusive alternatives to the force employed," does this factor weigh "against finding the use of force reasonable." *See id.* (internal quotation and citation omitted).

Here, evidence in the record indicates that there was not a "clear, reasonable and less intrusive alternative[]" to the use of deadly force. Officer Dote did not have a taser on his person

Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

when Decedent ran towards the officers with a knife. ECF No. 49-5 at 9, Dote Depo. at 38

("Q. . . . [D]id you have a taser on your person? A. Not on my person. It was in my vehicle.").

Officer Soh *may* have had a taser on his person. Plaintiffs only point to Officer Dote's statement

that he thought Officer Soh had a taser, but there is no direct evidence cited by Plaintiffs that show

that Officer Soh actually had a taser on his person. *Id.* ("Q. . . . And how about Officer Soh, as far

as you know [did he have a taser]? A. I believe he did. Q. On his person? A. I believe so. Q.

Okay. I'm going to ask him about that directly so I'll move ahead.").

Regardless, even if Officer Soh had a taser on his person, Officers Dote and Soh both

testify that a taser would have not been a reasonable alternative under the circumstances because

Decedent was rapidly approaching the officers with a knife. Both officers note that the electrodes

on tasers spread outward when shot towards a suspect, and that it can be very difficult to hit a

moving target with both electrodes. Dote Decl. ¶ 22 ("A taser would not have been an appropriate

weapon in this situation because it is too difficult to hit a running person with both prongs of the

taser, as necessary for its use, unless the person is very close. Even then, the taser is not 100%

effective. I believed that if the man was close enough to use a taser, he would have attacked me

with the knife."); Soh Decl. ¶ 21 (same). Moreover, a taser provides only one shot. Thus, a taser

may have been ineffective, as the officers may have missed Decedent with the taser, which would

have allowed Decedent to get within striking range of the officers. *See Serrano*, 2016 WL

1089225 at *7 (relying on testimony that "in [the firing officer's] experience, a Taser was not

always reliable"). Plaintiffs do not point to evidence that a taser was an appropriate weapon under

the circumstances in the instant case. Reply at 10 ("Plaintiffs do not dispute that and offer no

evidence to support their argument that 'a nonlethal taser could have ended the situation.'"

(quoting Opp'n at 12)).

Plaintiffs also imply that the officers should have retreated. However, police officers have

no duty to retreat when faced with an imminent threat. *See, e.g.*, *Reed v. Hoy*, 909 F.2d 324, 331

(9th Cir. 1989) (concluding duty to retreat would "be inconsistent with police officers' duty to the

public"), *overruled on other grounds by Virginia v. Moore*, 553 U.S. 164, 175 (2008); *Tucker v.*

*Las Vegas Metro. Police Dept.*, 470 F. App'x 627, 630 (9th Cir. 2012) (Tallman, J. concurring) (citing *Reed*, 909 F.2d at 331) (noting "police officers have no duty to retreat when threatened with physical assault"); *see also* Cal. Penal Code § 835a ("A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested.").  The officers here were responding to a 911 call in which the 911 caller said that an unidentified man was threatening the caller's family with a knife and that the caller was locked in a room with his kids to keep them safe.  Dispatch Log at 144.  When the officers arrived on the scene, Decedent locked eyes on the officers and started walking and then running towards them with a knife in his right hand.  ECF No. 44-1 at 94, Dote Depo. at 122.

In response, the officers in this case made an attempt to engage in a "tactical withdraw" by moving backwards, but Decedent continued advancing on the officers.  Additional actions taken to retreat in the circumstances of this case could have put the officers and others at risk.  If the officers turned their backs to run away, Decedent may have been able to catch and harm the officers.  Soh Decl. ¶ 20 ("The man was running at me, and trying to run away or turn would have made me vulnerable to attack.").  Moreover, such an action would have left Deviny Buchanan and Sylvia Buchanan and other residents in the neighborhood in danger.  Moreover, as far as the officers were aware, the 911 caller and his children who had locked themselves in a room at 1377 Sherman Street could have needed immediate assistance.  It would have been inconsistent with the officers' duty to the public to abandon the people in the area who were potentially in danger.

Accordingly, the Court finds that Plaintiffs' arguments about "alternative strategies" do not render the officers' actions unreasonable.

### ii.    Decedent's Mental Illness

Plaintiffs argue that the officers knew or should have known that Decedent was mentally ill and that the officers should have taken that into account when determining whether to shoot

Decedent.[6]  The Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals."  *See Bryan*, 630 F.3d at 829.  Still, it is true that there are circumstances where a mentally ill individual's mental illness warrants the avoidance of the use of excessive force.  For example, in *Glenn*, 673 F.3d 864, police were dispatched after a 911 call where the suspect's parents stated that the suspect was suicidal.  *Id.* at 871.  The police encountered the suspect in the front yard holding a pocketknife to his own neck.  *Id.*  When the suspect got up and started walking towards his house, the police shot the suspect with a beanbag gun and then with actual bullets, and thus killed the suspect.  *Id.*  The Ninth Circuit held that a jury should decide whether the force used was excessive because there was "little evidence" that the suspect was a danger to the officers or to his family.  *Id.*  Indeed, the officers knew that they had been called to prevent a suicide.  *Id.*

The circumstances are entirely different here.  First, there is no evidence in the record that Officers Dote and Soh knew that Decedent was mentally ill and wanted to kill himself.  The only evidence to which Plaintiffs point is the fact that Officers Dote and Soh knew that a unit with a 40mm less-than-lethal round gun was en route to the scene.  However, there is no evidence that such devices are called upon only when an individual is mentally ill.  Officer Raymond McNair, another responding officer who arrived on the scene soon after the shooting, testified that the police "do their best to ensure that there is an arranged less than lethal weapon that can respond to the scene.  So just so [sic] we can bring as many resources to bear as possible."  ECF No. 49-10 at 23, McNair Depo. at 119.  Thus, a unit with a 40mm less-than-lethal round gun being en route would not inform Officers Dote and Soh that Decedent was mentally ill.  Indeed, the dispatcher requested a less-than-lethal option with no knowledge that the assailant at 1377 Sherman Street was mentally ill.

Plaintiffs also argue that Decedent's actions clearly show that he was mentally ill.

---

[6] After the shooting, Deviny Buchanan told a police detective that Decedent was on steroids and that Decedent's steroid use correlated with his mood swings.  ECF No. 44-1 at 39, D. Buchanan Depo. at 166.

21

Plaintiffs assert that the fact that Decedent raised the knife in the air and then ran at the officers shows that he was trying to commit suicide by cop and was mentally ill. Moreover, Sylvia Buchanan and Deviny Buchanan were both yelling at the officers not to shoot and that Decedent needed the officer's help as Decedent ran towards the officers. However, this is insufficient to enable the officers to conclude that Decedent was mentally ill. Moreover, Plaintiffs cite to no authority, and the Court is unaware of any authority, that requires police officers to diagnose the mental health of a fast approaching suspect with a knife.

Second, even if the Officers had some knowledge that Decedent was mentally ill, the Officers were not required to put themselves in danger when Decedent posed an imminent risk of death or serious bodily harm. *See Lal*, 746 F.3d at 1114 (holding that officers were justified in shooting a mentally ill person holding a football-sized rock over his head because he posed an imminent danger to the officers); *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (noting that "the degree of threat posed by the suspect is the most important factor" in a reasonableness analysis). The knowledge that Decedent was mentally ill would not have changed the fact that Decedent may have used the knife to harm the officers. Indeed, his mental illness may have made Decedent even more determined to reach the officers in an attempt to hurt or kill them to ensure that his plan to commit "suicide by cop" came to fruition. Therefore, Decedent's mental illness does not render the officers' actions unreasonable.

### iii. Whether Decedent Was Moving Forward When He Was Shot

Plaintiffs argue that Sylvia Buchanan's deposition testimony creates a triable issue of material fact as to whether Decedent was actually moving towards the officers at the time he was shot. However, Sylvia Buchanan's testimony does not create a triable issue of material fact as to whether Decedent was moving towards the officers at the time he was shot because it contradicts her prior testimony and the other evidence in the record. The Ninth Circuit has held that where a plaintiff's deposition testimony "is uncorroborated and self-serving" and "flatly contradicts [] prior sworn statements and the [other] evidence," there is not "sufficient disagreement to require submission to a jury." *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (quoting

22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Sylvia Buchanan's testimony that Decedent was standing still contradicts every other piece of evidence before the Court, including Sylvia Buchanan's prior statements to the police immediately after the shooting. In the police interview following the shooting, Sylvia Buchanan states that Decedent ran towards the officers and does not mention Decedent stopping. ECF No. 50-1 at 9–10, S. Buchanan Depo. at 108 (stating that "[Decedent] was running to them" and that Sylvia Buchanan was "trying to get behind him [and] hollering, begging, saying, 'Phil, please, stop. Stop.'").

Moreover, Deviny Buchanan repeatedly states that Decedent was attempting to commit suicide and ran at the officers with the knife. Deviny Buchanan told Decedent's mother on the phone immediately after the accident that "when [Decedent] saw the cops walking up, he took out a knife and ran at them." Corral Decl. Ex. 3 at 8–9; ECF No. 44-1 at 28, D. Buchanan Depo. at 148; *see also* Corral Decl. Ex. 3 at 5:55–6:58 ("Phill tried to commit suicide and he ran at the cops with a knife and they fucking shot him."; "Phill came downstairs and said 'I called the police so they'll shoot me.'"). In a recorded phone call to Deviny Buchanan's friend, Tiffany, Deviny Buchanan stated that "[h]e called the cops on himself and ran at the fucking cops with a knife." *Id.* at 12:15–12:54; ECF No. 44-1 at 31, D. Buchanan Depo. at 151. Deviny Buchanan also sent a text message at 5:40 p.m. on the day of the shooting that stated "phill tried to commit suicide and called the cops amd [sic] ran at them wit [sic] a knife and the cops shot him." ECF No. 44-2 at 8. In an interview with the police later on the day of the shooting, Deviny Buchanan stated that "it kind of looked like [Decedent] wanted [the police] to shoot him" and "[h]e called [the police]. So it's like he wanted them to come just so he could charge at them to get shot." Corral Decl. Ex. 4 at 37:30–37:58; ECF No. 44-1 at 42–43, D. Buchanan Depo. at 169–70.

In addition, the testimony of other non-party witnesses indicates that Decedent was moving towards the officers when he was shot. Gonzalez, the witness who took the video after the shooting, states that Decedent was walking towards the officers and then began to "accelerate his pace" and was "starting to run." ECF No. 44-1 at 118–20, Gonzalez Depo. at 15–17 ("I actually did see him picking up the run."). Gonzalez states that he "knew something was going to happen"

because of "the pace [Decedent] was going towards the officers." *Id.*

Similarly, Menchaca, another witness at the scene of the shooting, stated in a deposition that she could only see the top half of Decedent's body, but that it looked like Decedent "accelerate[d]" and "lunge[d] toward the officers." ECF No. 44-1 at 129–31, Menchaca Depo. at 25–27. Menchaca stated it was almost like he was "initiating some sort of fight or a run forward." *Id.* Alternatively, Menchaca described the lunge forward as a "taunt," which she further described as a "lunge" and an action that "someone would do if they were trying to engage someone" to "try to chase him" or "to try to break through [the officers]." *Id.*

Officers Dote and Soh also state that Decedent was "running and sprinting" towards them with a knife when the officers shot Decedent. Dote Decl. ¶ 20; Soh Decl. ¶ 20. Officer Soh stated in a deposition that "I knew that if I had delayed another second longer, he would been [sic] right on top of me." ECF No. 44-1 at 105, Soh Depo. at 113.

Finally, the distances obtained through measurements at the scene of the shooting show that Decedent must have been moving forward when he was shot. Plaintiffs assert that the officers began to shoot Decedent when Decedent was approximately 55 feet away from the officers, Opp'n at 16 (Plaintiffs arguing that Decedent was shot while "standing nearly fifty-five feet away from [the officers] holding a knife"), and the undisputed evidence shows that Decedent fell to the ground 17 feet 10 inches from the officers. Plaintiffs' attempt to state that Decedent was not moving forward contradicts their own proposed version of events. Thus, Sylvia Buchanan's deposition statement that Decedent stopped moving forward does not create a genuine dispute of material fact as to whether Decedent was moving forward when he was shot.

Moreover, Sylvia Buchanan's testimony does not actually contradict the position that Decedent was moving towards the officer with a knife when he was shot. Sylvia Buchanan stated that Decedent stopped when he was commanded to stop. However, when asked what Decedent did after he stopped, Sylvia Buchanan states that she does not remember and that all she remembers is the gunfire. ECF No. 44-1 at 56–57, S. Buchanan Depo. at 79–80 ("Q. And after he stopped, did he start moving toward them again? A. The only thing I remember is gunfire. Q. So

you don't remember whether he started moving toward them again? A. I was screaming, and I was moving. So whether he was moving, I can't remember. The only thing I remember is them shooting at him, dropping to the ground, and they kept shooting."). Thus, even if the Court assumes that Sylvia Buchanan's testimony that Decedent stopped is true, that testimony does not contradict the evidence that Decedent was shot while moving towards the officers because Sylvia Buchanan's testimony does not foreclose the possibility that Decedent started moving towards the officers after he stopped. Courts have previously held that deadly force may be justified when a decedent who has initially complied with commands takes further actions that provide the officers probable cause to believe that the suspect poses an immediate risk of death or substantial bodily harm to the officers. *See Lal*, 746 F.3d at 1114 (holding officers justified in shooting a suspect who had initially complied with commands, but then advanced on officers while holding a football-sized rock over his head).

Accordingly, Sylvia Buchanan's testimony about whether Decedent was moving forward at the time he was shot do not prevent the Court from granting summary judgment.

### iv. Decedent's Arm Position

Defendants quote the testimony of Officer Dote which states that Decedent's "right arm was outstretched. His elbow was slightly bent. It wasn't locked out or it wasn't folded, it was slightly bent. . . . And he was holding the knife in a position where the knife blade was sticking up." Reply at 5 (quoting ECF No. 49-5 at 43, Dote Depo. at 113); *see also* ECF 49-5 at 32, Dote Depo. at 91 (noting that Decedent's "right hand was outstretched to the side of his body" with the knife "pointed up" in his right hand).

Plaintiffs cite the same testimony to argue in their opposition that Decedent was holding the knife "straight up in the air with his arm straight out," that is, with his arm "outstretched vertically to the side of his body." Opp'n at 3, 11. Plaintiffs cite no other evidence in support of their argument. Plaintiffs argue that Decedent's arm position while running towards the officers shows that a reasonable officer would not have found Decedent to pose a risk of imminent harm.

Although it is not exactly clear what it means for an arm to be outstretched to the side of

one's body, the testimony of Officer Dote, the only evidence cited by the parties on the issue of Decedent's arm position, does not support Plaintiffs' contention that Decedent's arm was "straight up in the air."

Moreover, the evidence in the record does not show that Decedent's arm was in an "outstretched" position with the knife pointed up the entire time he was running towards the officers. Officer Dote testifies that Decedent was first "talking face to face" with an African-American woman, then Decedent "turned to face [the officers]," at which point Decedent's "right hand was outstretched to the side of his body" with the knife "pointed up" in his right hand. ECF 49-5 at 32, Dote Depo. at 91. That action caused the officers to draw their weapons. *Id.* at 92. Decedent then started walking and then running towards the officers. *Id.* There is no testimony that Decedent walked and ran at the officers with his arm outstretched the entire time. Indeed, in response to a question about where the knife was pointing when Decedent was running towards the officers, Officer Soh states that "I can only say the blade was facing me, and many times it was pointing at me as he was running [towards the officers]." ECF No. 44-1 at 106, Soh Depo. at 120.

Moreover, even if Decedent had kept his arm outstretched straight up in the air while running towards the officers, there is no evidence in the record that he posed less of a threat because of that arm position. Plaintiffs' argument concerning the position of Decedent's arm does not create a triable issue of material fact that prevents the Court from granting summary judgment. Accordingly, because the facts in the record show that Officers Dote and Soh utilized deadly force in response to an imminent risk of death or serious bodily harm, the Court finds that the Officers use of force was not excessive and did not violate the Fourth Amendment.

### 2. Qualified Immunity

Even if the officers' use of deadly force violated the Fourth Amendment, Defendant argues that Plaintiffs' § 1983 claim against Officers Dote and Soh fails because the officers' actions are protected by qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308

United States District Court
Northern District of California

(2015) (per curiam). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Sheehan*, 135 S. Ct. at 1774. The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mendez v. Cty. of L.A.*, 815 F.3d 1178, 1186 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The United States Supreme Court has explained that there are two questions a court must resolve to determine whether qualified immunity applies: (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right;" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201). Qualified immunity applies unless the answer to both questions is "yes." *Id.*

As discussed above, the Court has concluded that Officers Dote and Soh did not violate the Fourth Amendment when they used deadly force against Decedent. Therefore, because Plaintiffs have not "ma[de] out a violation of a constitutional right," Officers Dote and Soh are protected by qualified immunity.

However, even if Officers Dote and Soh had violated the Fourth Amendment by using deadly force against Decedent, the officers did not violate a right that was "'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. "In the context of excessive force claims, the [United States] Supreme Court has held that qualified immunity serves 'to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Kiles v. City of N. Las Vegas*, 276 F. App'x 620, 621–22 (9th Cir. 2008) (quoting *Saucier*, 533 U.S. at 202).

A district court in the District of Nevada encountered a similar situation to the one at issue here in *Chavez v. Las Vegas Metropolitan Police Department*, 2014 WL 374444. In that case, the police were responding to a domestic disturbance call. *Id.* at *6–9. The officers knew that the suspect "had threatened to kill the officers if they arrived at the scene, and that [the suspect] had

expressed a desire to commit suicide by cop." *Id.* When the officers arrived, the suspect approached the officers while waving a knife. *Id.* After a warning, the officers shot the suspect with less-than-lethal beanbag rounds. *Id.* "At no point did Olivas respond to the officers' commands, stop his advance toward the officers, drop his weapon, or indicate a willingness to relinquish it." *Id.* When the suspect was 36 feet from the officers, two officers shot and killed the suspect. *Id.*

The *Chavez* court held that the officers were protected by qualified immunity. The *Chavez* court reasoned that the officers were "forced to make a split-second decision whether [the suspect] would inflict serious harm if they did not deploy deadly force" and that they were responding to a "rapidly escalating and volatile situation" that lasted only two minutes. *Id.* at *8. Thus, the *Chavez* court found that "a reasonable officer would not have known that his or her actions constituted excessive force under the circumstances." *Id.* Moreover, the *Chavez* court noted that even though the officers were trained that a suspect with a knife posed a threat once that suspect was "within 21 feet," "the contours of the law with respect to the use of deadly force are [not] sufficiently clear such that a reasonable officer under the circumstances would understand that his conduct violates that law." *Id.*; *see also Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 363–64 (D. Me. 2011) (holding that deadly force against a suspect holding a knife and moving closer to officers "appears objectively reasonable and, at the very least, is entitled to qualified immunity").

Here, for the same reason that the Court found the officers' actions to be reasonable under the Fourth Amendment above, the Court finds that clearly established law did not place the officers on notice that their actions were unconstitutional. The entire incident occurred over a period of only 17 seconds. Dispatch Log at 144–45 (officers report Decedent walking towards the officers with a knife at 5:04:38 p.m. and officer report that shots were fired at 5:04:55 p.m.). As discussed above, it is not genuinely disputed that Decedent was running towards the officers with a knife and that it was a matter of seconds before Decedent would have reached the officers, at which point Decedent potentially could have killed or seriously harmed the officers. Even more so than in *Chavez*, the officers opened fire in response to a "rapidly escalating and volatile

28

situation" created by Decedent's rapid advancement towards the officers with a knife.

Moreover, as in *Chavez* and the constitutional violation analysis above, the fact that the officers were trained that a suspect with a knife poses an imminent danger of harm when within 21 feet of the officers does not change the Court's finding. *See.* ECF No. 44-1 at 90, Dote Depo. at 116 (explaining that Dote was trained that "anyone or somebody armed with a knife" poses a threat of grave bodily injury if they are within 21 feet). Nothing in the record indicates that a suspect with a knife outside the 21-foot distance cannot pose an imminent risk of harm. Indeed, Officer Dote testifies that "at 21 feet, that's almost too late to start, you know, engaging a threat if they are coming at you with a deadly weapon." ECF No. 44-1 at 93, Dote Depo. at 119. In this case, Decedent was running towards the officers with a knife and was within a few seconds of reaching them, and thus posed a risk of imminent harm. Moreover, when Decedent finally fell to the ground, he was 17 feet 10 inches from the officers—within 21 feet of the officers. Thus, even more so than in *Chavez*, under the circumstances in this case, "a reasonable officer under the circumstances would [not] understand that [the officers'] conduct [of shooting a suspect running at the officers before the suspect was within 21 feet of the officers] violates th[e] law." *Chavez*, 2014 WL 374444 at *9. As a result, no clearly established law indicates that the officers' use of deadly force was unconstitutional.

Accordingly, because the officer's actions were objectively reasonable, or in the alternative, are protected under the doctrine of qualified immunity, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiffs' § 1983 claim against Officers Dote and Soh.

### C.     Bane Act Claim

Plaintiffs also assert a claim based on California's Bane Act against Officer Dote, Officer Soh, and the City of San Jose.[7] The Bane Act punishes any "person or persons, whether or not

---

[7] Plaintiffs' complaint and its opposition to the instant motion do not differentiate Plaintiffs' Bane Act claim analysis between the individual officer defendants, Officers Dote and Soh, and the City of San Jose. Plaintiffs' Bane Act claim is based on Officer Dote's and Officer Soh's use of deadly force. Plaintiffs do not assert or argue a separate theory of liability against the City of San Jose.

1    acting under color of law, [who] interfere[] by threat, intimidation, or coercion, or attempt[] to

2    interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or

3    individuals of rights secured by the Constitution or laws of the United States, or of the rights

4    secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a). The Bane Act also

5    provides a cause of action for anyone whose rights are harmed in this way. Cal. Civ. Code §

6    52.1(b). In order to state a claim under the Bane Act, Plaintiffs must allege "(1) interference with

7    or attempted interference with a state or federal constitutional or legal right, and (2) the

8    interference or attempted interference was by threats, intimidation, or coercion." *Allen v. City of*

9    *Sacramento*, 234 Cal. App. 4th 41, 67 (2015).

10       Plaintiffs' Bane Act claim asserts that Officers Dote and Soh violated Decedent's federal

11   constitutional right to be free of excessive force under the Fourth Amendment of the United States

12   Constitution. Defendants argue that the officers did not violate the Bane Act because (1) the

13   officers did not violate the Fourth Amendment, and (2) the officers did not utilize "threats,

14   intimidation, or coercion" separate from the alleged violation of the Fourth Amendment itself.

15       The Court held above that Officers Dote and Soh did not violate the Fourth Amendment by

16   using deadly force against Decedent. Accordingly, because the officers' actions did not violate the

17   Fourth Amendment, and Plaintiffs do not allege or provide evidence of any other state or federal

18   right violated by the officers' actions as the basis for Plaintiffs' Bane Act claim, the officers'

19   actions do not constitute "interference with or attempted interference with a state or federal

20   constitutional or legal right." *Allen*, 234 Cal. App. 4th at 67. As a result, Plaintiffs' Bane Act

21   claim fails. Because Plaintiffs' Bane Act claim fails for lack of a Fourth Amendment violation,

22   the Court need not reach Defendant's second argument regarding separate "threats, intimidation,

23   or coercion."

24       Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to

25

26   _____

27   Accordingly, the Court finds that the Bane Act claim against the City of San Jose survives the
     instant motion for summary judgment only if the Bane Act claim against Officers Dote and Soh
     survives.

28
Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' Bane Act claim.

### D. Ralph Act Claim

Plaintiffs assert that Officer Dote, Officer Soh, and the City of San Jose violated the Ralph Act because the shooting of Decedent "was motivated in part by racial bias."[8] Compl. ¶ 42. The Ralph Act guarantees people in California "the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any [listed] characteristic." Cal. Civ. Code § 51.7(a). This statute, along with the Bane Act, was enacted to "provide a civil remedy for hate crimes." *D.C. v. Harvard–Westlake Sch.*, 176 Cal. App. 4th 836, 844 (2009); *accord Ramirez v. Wong*, 188 Cal. App. 4th 1480, 1486 (2010). To prevail on their Ralph Act claims, Plaintiffs must establish four elements: "(1) Defendants committed or threatened violent acts against Plaintiffs; (2) Defendants were motivated by their perception of Plaintiffs' political affiliation [or listed characteristic]; (3) Plaintiffs were harmed; and (4) Defendants' conduct was a substantial factor in causing Plaintiffs harm." *Campbell v. Feld Entm't, Inc.*, 75 F. Supp. 3d 1193, 1205 (N.D. Cal. 2014); *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 881 (2007) (outlining the elements of a Ralph Act claim).

Where there is "direct evidence of discriminatory motive, such as statements that were overtly bigoted, summary judgment on the question of racial bias generally is inappropriate." *Hutton v. City of Berkeley Police Dep't*, 2014 WL 4674295, at *10 (N.D. Cal. Sept. 9, 2014) (citing *Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007)). However, "to survive summary judgment based on circumstantial evidence of racial bias, that evidence must be 'specific and substantial.'" *Id.* (quoting *Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1152 (9th Cir. 2006)). For

---

[8] Plaintiffs' complaint and its opposition to the instant motion do not differentiate Plaintiffs' Ralph Act claim analysis between the individual officer defendants, Officers Dote and Soh, and the City of San Jose. Plaintiffs' Ralph Act claim is based on Officer Dote's and Officer Soh's use of deadly force. Plaintiffs do not assert or argue a separate theory of liability against the City of San Jose. Accordingly, the Court finds that the Ralph Act claim against the City of San Jose survives the instant motion for summary judgment only if the Ralph Act claim against Officers Dote and Soh survives.

31

example, in *Warren v. Marcus*, 78 F. Supp. 3d 1228 (N.D. Cal. 2015), the plaintiff testified that he heard someone use a racial epithet after he was shot by police officers. *Id.* at 1248. However, because the defendant was not near the plaintiff after the shooting, and there was no evidence linking the defendant to that racial epithet, the *Warren* court granted the defendant's motion for summary judgment on the Ralph Act claim. *Id.*

Here, Plaintiffs argue that "circumstantial evidence indicates that race played a part in the shooting." Opp'n at 22. Plaintiffs argue that the following series of inferences and assumptions show racial animus on the part of the officers: (1) Officers Dote and Soh were in the Gang Suppression Unit, (2) officers in the gang suppression unit are "predisposed to assuming" that any situation is a gang situation, *id.*, (3) another officer, Officer McNair, testified that a "very high concentration of gang members" are in the area, (4) the Bloods and Crips, who wear red and blue respectively, are African-American gangs that are active in the area, and (5) "a jury could infer that Dote and Soh shot [Decedent] based on the false assumption that he was a dangerous gang member because he was an African American man wearing red, not because he posed any real threat," *id.* at 22–23. In response, Defendants argue that Plaintiffs have presented no evidence that Officers Dote and Soh were motivated even in part by racial bias when they shot Decedent.

The Court agrees with Defendants. This circumstantial series of inferences and assumptions cited by Plaintiffs is not "specific and substantial" evidence that Officers Dote and Soh were motivated by racial bias. *Hutton*, 2014 WL 4674295 at *10. This series of inferences and assumptions relies on speculation about the racial bias of Officers Dote and Soh based on Officers Dote's and Soh's generalized testimony about the gang suppression unit. That testimony, despite Plaintiffs' argument to the contrary, contains no evidence that members of the gang suppression unit are "predisposed to assuming" that any situation is a gang situation. Indeed, the testimony Plaintiffs' rely on for that point is Officers' Dote's and Soh's general testimony about who is in the gang suppression unit and why it exists. *See* ECF No. 49-4 at 17–18, Soh Depo. at 52–53; ECF No. 49-5 at 7–8, Dote Depo. at 13–14.

Moreover, there is no evidence that Officers Dote and Soh treated the incident in the

Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

instant case as a "gang situation" or that they assumed that Decedent was a gang member. The officers here were responding to a 911 call in which the 911 caller said that an unidentified man was threatening the caller's family with a knife and that the caller was locked in a room with his kids to stay safe. Dispatch Log at 144. When the officers arrived on the scene, Decedent locked eyes on the officers and started walking and then running towards the officers with a knife in his right hand. ECF No. 44-1 at 94, Dote Depo. at 122. Decedent did not comply with commands to stop and drop the knife. ECF No. 44-1 at 89, Dote Depo. at 115. Thus, the evidence in the record shows that the officers shot Decedent because he posed an imminent risk of harm to the officers. The record simply contains no evidence that Officers Dote and Soh shot Decedent because of Decedent's race.

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiffs' Ralph Act claim.

### E.     Assault and Negligence Claims

Plaintiffs Sylvia Buchanan and Deviny Buchanan only also assert claims for assault and negligence against Officers Dote, Officer Soh, and the City of San Jose.[9] These claims for assault and negligence are both based on the assertion that when the officers shot Decedent, the officers almost hit Sylvia Buchanan and Deviny Buchanan who were bystanders that were in front of 1377 Sherman Street Decedent.

A claim for negligence requires Plaintiffs to show (1) a legal duty to use reasonable care, (2) a breach of that duty, (3) proximate causation, and (4) injury to the plaintiffs. *Phillips v. TLC Plumbing*, 172 Cal. App. 4th 1133, 1139 (2009). A police officer has a legal duty "to use

---

[9] Plaintiffs' complaint and its opposition to the instant motion do not differentiate Plaintiffs' assault and negligence claims analysis between the individual officer defendants, Officers Dote and Soh, and the City of San Jose. Plaintiffs' assault and negligence claims are based on Officer Dote's and Officer Soh's use of deadly force and the fact that Sylvia Buchanan and Deviny Buchanan were behind Decedent when the officers fired their weapons. Plaintiffs do not assert or argue a separate theory of liability against the City of San Jose. Accordingly, the Court finds that the assault and negligence claims against the City of San Jose survive the instant motion for summary judgment only if the assault and negligence claims against Officers Dote and Soh survive.

Case No. 15-CV-05786-LHK
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

reasonable care in deciding to use and in fact using deadly force." *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1101 (2004), *disapproved on other grounds by Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 629 (2013).

Additionally, the essential elements of a cause of action for assault are: "(1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." *Yun Hee So v. Sook Ja Shin*, 212 Cal. App. 4th 652, 668–69 (2013) (as modified).

The California Court of Appeal has held that a determination that an officer's use of deadly force is objectively reasonable under § 1983 precludes negligence, assault, and battery claims. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) (finding that negligence and assault and battery claims were defeated through an analysis identical to the § 1983 standard). Under California law, an officer "'may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance.'" *Munoz*, 120 Cal. App. 4th at 1102 (quoting Cal. Penal Code § 835a). Thus, a negligence cause of action is defeated where an officer's "use of deadly force [is] objectively reasonable under the circumstances" because such an officer has not breached his or her duty of reasonable care. *Brown*, 171 Cal. App. 4th at 534. Similarly, with respect to an assault or battery cause of action, "a plaintiff must prove that the peace officer's use of force was unreasonable." *Id.* at 533 (citing *Munoz*, 120 Cal. App. 4th at 1102 n.6); *cf. id.* ("A state law battery claim is a counterpart to a federal claim of excessive use of force."). Thus, if the officers' actions were objectively reasonable, Plaintiffs' negligence and assault claims do not survive.

Moreover, negligence and assault claims are both subject to California Penal Code 196. "Under Penal Code section 196, a police officer who kills someone has committed a justifiable homicide if the homicide was necessarily committed in overcoming actual resistance to the

34

execution of some legal process, or in the discharge of any other legal duty." *Id.* (internal quotation marks omitted). "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances reasonably create[d] a fear of death or serious bodily harm to the officer or to another." *Id.* (internal quotation marks omitted) (alteration in original). "There can be no civil liability under California law as the result of a justifiable homicide." *Id.*; *see also Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 418 (1991) (holding that a justifiable homicide is a privileged act, which precludes all tort liability arising from that act).

In the instant case, the Court held in the section addressing Plaintiffs' § 1983 claim above that the officers' use of deadly force was reasonable because the officers had probable cause to believe that Decedent posed an imminent risk of death or serious bodily harm to the officers. This finding defeats Plaintiffs' claims for negligence and assault, both of which fail if an officer's actions were objectively reasonable. *See Brown*, 171 Cal. App. 4th at 533–34 (holding that negligence and assault and battery claims failed where an officer's actions were objectively reasonable).

Moreover, with respect to California Penal Code § 196, for the same reason that the Court found above that the officers had probable cause to believe that Decedent posed an imminent risk of death or serious bodily harm to the officers, the Court similarly finds that the "circumstances reasonably create[d] a fear of death or serious bodily harm to the officer[s]" under California Penal Code § 196. *Brown*, 171 Cal. App. 4th at 533. Therefore, the Court finds that the officers' use of deadly force was justifiable, rendering the officers immune from civil liability under California law. *See Gilmore*, 230 Cal. App. 3d at 418 (holding that a justifiable homicide is a privileged act).

Thus, because the officers acted reasonably and Decedent's shooting was justified under California Penal Code § 196, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiffs' negligence and assault claims.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: May 4, 2017

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge